UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NCB MANAGEMENT SERVICES, INC.,

    Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE CORP.,
as Receiver for Advanta Bank Corp., Draper,
Utah,

    Defendant.

Civil Action No. 11-00700 (CKK)

**MEMORANDUM OPINION AND ORDER**
(February 14, 2012)

Plaintiff NCB Management Services, Inc. ("NCB") brings this action against the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as the receiver for Advanta Bank Corporation ("Advanta"), a failed financial institution in Utah that was closed by state authorities in March 2010. In this action, NCB claims that, after the FDIC was appointed as the receiver for Advanta, it breached a pre-existing services agreement between NCB and Advanta by failing to submit timely payment under the terms of the agreement, breached the implied covenant of good faith and fair dealing by attempting to "retroactively repudiate" the agreement, and improperly denied NCB's claim for compensation from the receivership estate. Currently before the Court is the FDIC's [8] Motion to Dismiss. Upon careful consideration of the parties' submissions, the relevant authorities, and the record as a whole, the Court shall GRANT-IN-PART and DENY-IN-PART the FDIC's Motion to Dismiss. Specifically, the Motion shall be GRANTED insofar as it seeks dismissal of NCB's claim for breach of the implied covenant of good faith and fair dealing (Count III) and shall be DENIED in all other respects, including insofar as it seeks

1

dismissal of NCB's claim for *de novo* judicial review of its claim against the receivership estate (Count I) and its claim for breach of contract (Count II).

## I. BACKGROUND

Prior to its failure, Advanta was one of the largest credit card issuers in the small business market. In furtherance of this line of business, Advanta contracted with various debt collection companies to collect on delinquent accounts. Beginning in January 2005, NCB was one of those debt collection companies. Compl. ¶ 5. Over the years, Advanta and NCB entered into a series of written agreements defining the contours of their contractual relationship. *Id.* For purposes of convenience and consistent with the parties' usage, the Court shall simply refer to those agreements in the singular as the "Collection Agreement." The facts stated below are gleaned from the allegations in the Complaint and the documents attached to the Complaint or incorporated therein.

Under the Collection Agreement, NCB was paid a base hourly rate for its debt collection services, coupled with a potential bonus hourly rate tied to NCB's collection performance. Compl. Ex. A (Fifth Addendum to Collection Agreement) § 3. Advanta was required to remit payment to NCB within ten days of receipt of an appropriate invoice. *Id.* Of particular relevance to this case, the Collection Agreement contemplated that NCB would provide collection services to Advanta for a period of indefinite duration. *Id.* § 6. Either party could terminate the agreement "by giving the other party at least 90 days prior written notice of its intent to terminate." *Id.* During the ninety-day termination period, NCB was obligated to "continue to provide services to [Advanta]" and Advanta was required to "pay NCB for each month" in accordance with the aforementioned compensation scheme. *Id.* § 3. In addition, thirty days into the termination period, Advanta had the option to reduce the number of hours of

services provided by NCB each month by up to one-third of the targeted goal in place at the beginning of the termination period. *Id.*

While the Collection Agreement was still in effect, Advanta failed. On March 19, 2010, the Utah Department of Financial Institutions closed Advanta and appointed the FDIC as the receiver. Compl. ¶ 8. Despite this development, NCB was still required to perform debt collection services under the terms of the Collection Agreement. *Id.* ¶ 9. NCB did so, with the FDIC's full knowledge and consent. *Id.*

On August 2, 2010, the FDIC sent NCB a "formal termination notice" indicating that it had "decided to exercise its option to terminate [the Collection Agreement] under the provision found in Section 3." Decl. of Andrew J. Dober ("Dober Decl.") Ex. A (Formal Termination Notice) at 1.[1] The FDIC also indicated that it had engaged a third party to "take[] over the servicing and administration of the Advanta Bank Corp. portfolio as of August 1, 2010." *Id.* Since Section 3 of the Collection Agreement obligated NCB to "continue to provide services" for a ninety-day period after receipt of the FDIC's formal termination notice, NCB was required to perform debt collection services to and including October 31, 2010. Compl. Ex. A (Fifth Addendum to Collection Agreement) § 3. In turn, the FDIC was required to "pay NCB for each month" during the termination period—namely, August, September, and October 2010. *Id.*

On August 30, 2010, NCB acknowledged receipt of the FDIC's formal notice of termination. Compl. ¶ 13. At the same time, NCB sent the FDIC an invoice in the amount of $774,646, allegedly reflecting the amount due to NCB for debt collection services rendered in the month of August 2010. *Id.* NCB also inquired whether the FDIC intended to reduce the

---

[1] The notice is incorporated into the Complaint by reference. *See* Compl. ¶ 10.

number of hours provided by NCB for the upcoming month. *Id.* The FDIC never paid the invoice or acknowledged NCB's correspondence. *Id.* ¶ 14.

On September 16, 2010, NCB sent a second invoice to the FDIC, again in the amount of $774,646, allegedly reflecting the amount due to NCB for debt collection services rendered in the month of September 2010. *Id.* NCB also included in its correspondence an account statement showing an outstanding balance of $1,549,292, allegedly reflecting the total amounts invoiced for August and September. *Id.* NCB also inquired again whether the FDIC intended to reduce the number of hours provided by NCB for the upcoming month. *Id.* That same day, the FDIC informed NCB that it would not be paying the outstanding invoices and that it was considering "retroactively repudiating" the agreement pursuant to its statutory powers as the receiver. *Id.* ¶¶ 15-16. The FDIC told NCB that it should expect written notification of its decision within three weeks. *Id.*

On October 4, 2010, before the FDIC sent written notification of its decision, NCB sent a third invoice to the FDIC, again in the amount of $774,646, allegedly reflecting the amount due to NCB for debt collection services rendered in the month of October 2010. *Id.* ¶ 17. In addition, NCB included an account statement showing an outstanding balance of $2,323,938, allegedly reflecting the total amounts invoiced for August, September, and October. *Id.*

The next day, October 5, 2010, the FDIC formally notified NCB that it was repudiating the Collection Agreement pursuant to its statutory powers as the receiver. *Id.* ¶ 18. The FDIC's notice provides, in part:

> The Receiver has determined that [the Collection Agreement] is burdensome and that the disaffirmance of said agreement(s) will promote the orderly administration of [Advanta's] affairs. The purpose of this letter is to inform you that the Receiver has elected to disaffirm the above referenced Agreement to the fullest extent, if any, that it represents an enforceable obligation of [Advanta] or

>the Receiver. * * * The disaffirmance . . . will be effective as of the date of this letter. However, the termination notice date under the Agreement of August 2, 2010 remains in effect.

Dober Decl. Ex. B (Formal Repudiation Notice) at 1-2.[2] The notice concludes by informing NCB that the FDIC's repudiation of the agreement "gives [NCB] a claim against the receivership estate" and instructs NCB how to go about filing a proof of claim. *Id.* at 2.

On October 19, 2010, NCB filed a proof of claim with the FDIC, seeking the $2,323,938 that it claims remained outstanding on the FDIC's account. Compl. ¶ 21; Dober Decl. Ex. C (Proof of Claim) at 1.[3] On March 10, 2011, and again on March 17, 2011, the FDIC disallowed NCB's claim against the receivership estate, concluding that NCB had not satisfactorily proven its claim. Compl. ¶ 25 & Exs. B-C.

NCB then commenced this action on April 8, 2011. Its Complaint has three counts. Count I seeks *de novo* judicial review of the FDIC's disallowance of NCB's claim against the receivership estate. *Id.* ¶¶ 36-38. Count II alleges that the FDIC breached the Collection Agreement by failing to submit timely payment on the three invoices issued by NCB for services allegedly rendered in August, September, and October 2010. *Id.* ¶¶ 39-42. Count III alleges that the FDIC breached the duty of good faith and fair dealing implicit in the Collection Agreement by attempting to "retroactively repudiate" the agreement. *Id.* ¶¶ 43-45.

The FDIC filed the pending Motion to Dismiss on June 24, 2011. *See* Mem. of P. & A. in Supp. of FDIC-Receiver's Mot. to Dismiss ("Def.'s Mem."). NCB filed its opposition on August 11, 2011. *See* NCB Management Services, Inc.'s Opp'n to FDIC-Receiver's Mot. to Dismiss ("Pl.'s Opp'n"). The FDIC filed a reply on September 1, 2011. *See* FDIC-Receiver's Reply to NCB's Opp'n to its Mot. to Dismiss. Accordingly, the motion is fully briefed and ripe

---

[2] The notice is incorporated into the Complaint by reference. *See* Compl. ¶¶ 18-20.

[3] The proof of claim is incorporated into the Complaint by reference. *See* Compl. ¶ 21.

for a decision. In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering a decision. *See* LCvR 7(f).

## II. LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. (8)(a), "in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Rule 12(b)(6) provides a vehicle for parties to challenge the sufficiency of a complaint on the ground that it "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When presented with a motion to dismiss for failure to state a claim, the district court must accept as true the well-pleaded factual allegations contained in the complaint. *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009), *cert. denied*, __ U.S. __, 130 S. Ct. 2064 (2010). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557). Rather, a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. The plaintiff must provide more than just "a sheer possibility that a defendant has acted unlawfully." *Id.* at 1950. When a complaint's

6

well-pleaded facts do not enable a court, "draw[ing] on its judicial experience and common sense," "to infer more than the mere possibility of misconduct," the complaint has not shown that the pleader is entitled to relief. *Id.*

### III. DISCUSSION

**A. The Court Shall Not Dismiss NCB's Claim for *De Novo* Review of the FDIC's Disallowance of its Claim Against the Receivership Estate (Count I) or NCB's Claim for Breach of Contract (Count II)**

NCB's Counts I and II are premised on the same sequence of events. On August 2, 2010, after assuming its role as the receiver for Advanta, the FDIC sent NCB a "formal termination notice" expressly invoking the termination provision in the Collection Agreement, thereby triggering a ninety-day termination period for the parties to wind down their contractual relationship. Under the Collection Agreement, NCB was required to continue providing debt collection services to the FDIC for the full ninety-day period, which would conclude on October 31, 2010. In turn, the FDIC was required to pay NCB for each of the three months comprising the termination period—namely, August, September, and October 2010. Through Counts I and II, NCB alleges that the FDIC breached the Collection Agreement, and later improperly disallowed its parallel claim against the receivership estate, by failing to submit payment on the three invoices that NCB issued for August, September, and October in the total amount of $2,323,938. Count I seeks *de novo* judicial review of the FDIC's disallowance of NCB's claim against the receivership estate. Compl. ¶¶ 36-38. Count II alleges that the FDIC breached the Collection Agreement by failing to submit timely payment on the three invoices. *Id.* ¶¶ 39-42.

The FDIC tenders a series of arguments as to why Counts I and II should be dismissed. Each argument turns on a shared premise—namely, that the FDIC properly repudiated the Collection Agreement in accordance with its statutory authority under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"). Enacted in response to the

7

"widespread failures of savings and loan associations in the 1980s," *Wells Fargo Bank, N.A. v. Fed. Deposit Ins. Corp.*, 310 F.3d 202, 204 (D.C. Cir. 2002), FIRREA "gives the receivers of failed [financial] institutions wide-ranging powers to consolidate and liquidate those institutions," *Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236, 241 (D.C. Cir. 1995). Most notably, FIRREA confers upon the FDIC "broad authority" to repudiate contracts that were entered into before its appointment as a receiver. *Id.* The statute provides:

> [T]he conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease—
>
> (A)   to which such institution is a party;
>
> (B)   the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and
>
> (C)   the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

12 U.S.C. § 1821(e)(1). Assuming that the FDIC properly repudiates a contract, FIRREA limits the universe of damages that a plaintiff can recover. *See Monrad v. Fed. Deposit Ins. Corp.*, 62 F.3d 1169, 1172 (9th Cir. 1995) ("[O]nce the FDIC properly repudiates a contract, the remaining issue is whether the claimant has suffered damages of the type allowed to be compensated by statute."). In this regard, the operative provision states:

> [T]he liability of the conservator or receiver for the disaffirmance or repudiation of any contract . . . shall be—
>
> (i)   limited to actual direct compensatory damages; and
>
> (ii)   determined as of—
>
> > (I)   the date of the appointment of the conservator or receiver . . . .

12 U.S.C. § 1821(e)(3)(A). The statute makes it clear that "the term 'actual direct compensatory damages' does not include—(i) punitive or exemplary damages; (ii) damages for lost profits or opportunity; or (iii) damages for pain and suffering." *Id.* § 1821(e)(3)(B).

As the United States Court of Appeals for the District of Columbia Circuit has observed, by limiting the universe of recoverable damages to those that are (i) actual, (ii) direct, and (iii) compensatory, "Congress appears . . . to have wished to distinguish between those damages which can be thought to make one whole and those that are designed to go somewhat further and put a plaintiff securely in a financial position he or she would have occupied but for the breach." *Office & Prof'l Emps. Int'l Union, Local 2 v. Fed. Deposit Ins. Corp.*, 27 F.3d 598, 604 (D.C. Cir. 1994); *see also McMillian v. Fed. Deposit Ins. Corp.*, 81 F.3d 1041, 1055 (11th Cir. 1996). Accordingly, if an agreement has been properly repudiated, FIRREA prevents a plaintiff from recovering "expectation" or "liquidated" damages. In the end, a plaintiff "cannot recover damages to put it in the same position it would have occupied but for the breach." *MCI Commc'ns Servs., Inc. v. Fed. Deposit Ins. Corp.*, __ F. Supp. 2d __, 2011 WL 3667433, at *7 (D.D.C. Aug. 22, 2011).

The FDIC argues that NCB's Counts I and II should be dismissed because NCB does not specifically identify any "actual direct compensatory damages" in the Complaint. According to the FDIC, the three months of fees invoiced by NCB for the months of August, September, and October 2010 are unrelated to actual damages suffered and thus represent an impermissible attempt to secure "expectation" or "liquidated" damages. While the FDIC's position may or may not prove to be meritorious upon further development of the factual record, it is unavailing at this procedural posture because it presupposes that the FDIC properly repudiated the Collection Agreement in accordance with FIRREA's requirements. The Court cannot accept that premise at

this time. It is also unclear from the Complaint what the amounts identified in the August, September, and October 2010 invoices actually represent.

As NCB observes, "[t]he FDIC must make the determination whether or not to repudiate a contract within a 'reasonable period' following [its] appointment as receiver." Pl.'s Opp'n at 11 (quoting 12 U.S.C. § 1821(e)(2)). Determining whether the FDIC has repudiated a contract within a "reasonable period" calls for a fact-specific inquiry that is not readily reducible to abstract formulations or principles. *See N.H. Assocs. Ltd. P'Ship v. Fed. Deposit Ins. Corp.*, 978 F. Supp. 650, 654 (D. Md. 1997); *Monument Square Assocs., Inc. v. Resolution Trust Corp.*, 792 F. Supp. 874, 878 (D. Mass. 1991); *Union Bank v. Fed. Sav. & Loan Ins. Corp.*, 724 F. Supp. 468, 471 (E.D. Ky. 1989). In this case, the FDIC does not suggest that it satisfied the statutory requirements for effective repudiation when it informed NCB on August 2, 2010 that it decided to exercise its option to terminate the Collection Agreement under the terms of that agreement, thereby triggering a contractual ninety-day termination period. Rather, the FDIC concedes that it first attempted to formally repudiate the Collection Agreement under FIRREA on October 5, 2010, more than six-and-a-half months after its appointment as the receiver and more than two months after it had already told NCB that it intended to wind-down the Collection Agreement according to the terms of the agreement. True, the FDIC is correct that, assuming its attempt to repudiate the Collection Agreement on October 5, 2010 was effective, NCB's potential recovery will be limited to "actual direct compensatory damages" measured as of March 19, 2010, the date of the FDIC's appointment as receiver. 12 U.S.C. § 1821(e)(3)(A). But if the FDIC's attempted repudiation was ineffective, then the question becomes what damages NCB would be entitled to under the Collection Agreement and ordinary principles of contract law. *See Country Club Assocs. Ltd. P'Ship v. Fed. Deposit Ins. Corp.*, 418 F. Supp. 429, 437 (D.D.C. 1996)

10

(observing that the failure to properly repudiate a contract "results in a continuation of the contractual obligation and the application of contractual principles to the dispute."). The Court does not doubt that the FDIC has broad authority to repudiate agreements under FIRREA. Still, that authority must be exercised within the parameters set by Congress. Whether the FDIC's attempted repudiation on October 5, 2010 was effective cannot be resolved at this procedural posture and must await further development of the factual record. Further, whether NCB is entitled to damages, and what form those damages might take, are questions that turn on whether the FDIC properly exercised its power of repudiation.[4]

The remaining question is whether NCB has stated a plausible claim that the FDIC failed to adhere to the terms of the Collection Agreement such that would support Counts I and II. Under Utah law, which governs the Collection Agreement by operation of an express choice-of-law provision, "[t]he elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001). It is undisputed that NCB has satisfied the first two elements. Under the Collection Agreement, NCB was required to continue providing debt collection services to the FDIC for the full ninety-day termination period and the FDIC, in turn, was required to pay NCB for each of the three months comprising the termination period—namely, August, September, and October. NCB alleges that the FDIC breached the Collection Agreement, and later improperly disallowed its claim against the receivership estate, by failing to submit payment on the three invoices that NCB issued for

---

[4] This observation extends to the FDIC's argument that NCB is effectively seeking to elevate its claims for compensation to the level of an "administrative expense" entitled to prioritized payment. Whether NCB's claims are entitled to such treatment turns in part on whether the FDIC's attempted repudiation was effective. *See* 12 U.S.C. § 1821(e)(7)(B).

August, September, and October in the total amount of $2,323,938. Meanwhile, despite the FDIC's assertions to the contrary, NCB has alleged that it continued to perform under the Collection Agreement and suffered damages as result. *See* Compl. ¶¶ 9, 13-14, 17, 41-42. At this stage, NCB may allege performance in general terms and need not plead with particularity damages that would typically be expected to flow from its claims. *See* FED. R. CIV. P. 8(a)(3); FED. R. CIV. P. 9(c), (g); *Browning v. Clinton*, 292 F.3d 235, 245 (D.C. Cir. 2002); *Haynes v. Navy Fed. Credit Union*, __ F. Supp. 2d __, 2011 WL 5867062, at *4 (D.D.C. Nov. 23, 2011).[5]

The Court reiterates: the FDIC's arguments may or may not prove to be meritorious upon further development of the factual record. But at this early stage, NCB's Counts I and II state plausible claims for relief and the Court's inquiry is therefore at an end. Accordingly, the Court shall DENY the FDIC's [8] Motion to Dismiss insofar as it seeks dismissal of Counts I and II.

> **B.     The Court Shall Dismiss NCB's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing (Count III)**

NCB's Count III alleges that the FDIC breached the implied duty of good faith and fair dealing in the Collection Agreement by attempting to "retroactively repudiate" the agreement. Compl. ¶¶ 43-45. To resolve this claim, the Court need not question NCB's contention that the FDIC may in some hypothetical circumstances be held liable for breach of the implied covenant of good faith and fair dealing. *See* Pl.'s Opp'n at 13-14. Even assuming, for the sake of argument, that such a theory is tenable in the abstract, the particular claim pressed by NCB in

---

[5] The Court acknowledges that NCB's opposition is somewhat cryptic in its descriptions of the nature of its performance during the termination period, *see* Pl.'s Opp'n at 10, but further development of the factual record will be required before the Court can ascertain whether NCB adequately performed under the Collection Agreement. For example, even though the Collection Agreement appears to contemplate a variable compensation structure, it is not clear why NCB billed the FDIC in equal amounts for August, September, and October, and seems to have billed the FDIC for the final month at the beginning of October, before any services could have been performed. But at this procedural posture, the Court credits NCB's allegation that it continued to perform under the Collection Agreement.

this case must nonetheless fail. In enacting FIRREA, Congress conferred upon the FDIC broad authority to repudiate burdensome contracts to promote the orderly administration of failed institutions' affairs. *See* 12 U.S.C. § 1821(e)(1). Congress decided that, when the FDIC properly exercises its statutory authority, its decision to repudiate a contract should have a certain measure of "retroactive" effect, insofar as it fixes the date for the determination of damages arising from repudiation at the time of the FDIC's appointment as receiver and not the time of repudiation. *See id.* § 1821(e)(3). Although NCB cloaks Count III in the dress of the implied covenant of good faith and fair dealing, the claim challenges the manner in which the FDIC exercised the broad statutory authority conferred upon it by Congress. As the factual record in this case is developed, it may or may not turn out that the FDIC failed to properly repudiate the Collection Agreement—for example, by failing to repudiate the agreement within a "reasonable period." *Id.* § 1821(e)(2). But even assuming that turns out to be the case, there is no independent cause of action for the FDIC's failure to properly repudiate an agreement. Rather, the failure to properly follow repudiation procedures merely results in the failure to repudiate the contract and the preservation of the underlying contractual obligations. *Country Club Assocs.*, 418 F. Supp. at 437; *accord Pageland 29 Ltd. P'Ship v. Fed. Deposit Ins. Corp.*, Civil Action No. 91-1858, 1992 WL 391377, at *4 (D.D.C. Dec. 14, 1992); *Patriot Square Assocs. v. Fed. Deposit Ins. Corp.*, Civil Action No. 91-1859, 1992 U.S. Dist. LEXIS 22530, at *6 (D.D.C. Sept. 25, 1992).[6] Thus, to the extent the FDIC's efforts to repudiate the Collection

---

[6] Viewed from a slightly different perspective, the implied covenant of good faith and fair dealing reflects a shared "promise not to intentionally or purposely do anything that will destroy or injure the other party's right to receive the fruits of the contract." *Prince v. Bear River Mut. Ins. Co.*, 56 P.3d 524, 433 (Utah 2002) (quotation marks and notions omitted). This principle, unobjectionable in most contractual disputes, fundamentally conflicts with FIRREA, through which Congress conferred upon the FDIC a unique capacity to override parties' contractual expectations—that is, to deprive them of the full "fruits of the contract."

Agreement were improper, NCB's remedy must be found in Counts I and II, not in the form of the implied covenant of good faith and fair dealing. Therefore, the Court shall GRANT the FDIC's [8] Motion to Dismiss insofar as it seeks dismissal of Count III.

### C. The Court Shall Not Strike Portions of the Complaint

Under Rule 12(f), a party may move the district court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). However, courts recognize that striking portions of pleadings is a drastic remedy and, accordingly, motions to strike are generally disfavored. *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd.*, 647 F.2d 200, 201 (D.C. Cir. 1981) (*per curiam*). "The decision to grant or deny a motion to strike is committed to the trial judge's sound discretion." *Fed. Trade Comm'n v. Cantkier*, 767 F. Supp. 2d 147, 159-60 (D.D.C. 2011).

Here, the FDIC asks the Court to strike paragraphs from the Complaint in which NCB describes how it submitted a proof of claim seeking compensation from the FDIC and how the FDIC ultimately disallowed the claim. *See* Compl. ¶¶ 22-29, 31, 33. In support, the FDIC contends that the allegations "overlook the confusion caused by NCB's filing of multiple proofs of claim" and are "irrelevant, since the FDIC's claim review process is not subject to judicial review." Def.'s Mem. at 18. As NCB observes, "it is routine for parties to provide . . . a certain amount of background information that is not directly relevant to the merits of the claim." *Patton Boggs, LLP v. Chevron Corp.*, 791 F. Supp. 2d 13, 22 (D.D.C. 2011). If the allegations challenged by the FDIC are not directly relevant to the merits of the NCB's claims, they nonetheless provide helpful context about the history of the parties' dispute. Given that NCB has unambiguously represented that it "is not seeking judicial review of the FDIC's decision to disallow its claims," but rather "a *de novo* determination of its claims," Pl.'s Opp'n at 16, the

Court harbors no concern that permitting these allegations to stand would engender any confusion or undue prejudice to the FDIC. Accordingly, the Court declines to exercise its discretion to strike the referenced allegations.[7]

### IV. CONCLUSION AND ORDER

For the reasons set forth above, it is, this 14th day of February, 2012, hereby

**ORDERED** that the FDIC's [8] Motion to Dismiss is GRANTED-IN-PART and DENIED-IN-PART. Specifically, the Motion is GRANTED insofar as it seeks dismissal of NCB's claim for breach of the implied covenant of good faith and fair dealing (Count III) and DENIED in all other respects, including insofar as it seeks dismissal of NCB's claim for *de novo* judicial review of its claim against the receivership estate (Count I) and its claim for breach of contract (Count II).

It is **FURTHER ORDERED** that an Initial Scheduling Conference shall be held on **March 21, 2012, at 9:30 a.m.,** before Judge Colleen Kollar-Kotelly in Courtroom 28A.

**SO ORDERED.**

                                                 /s/
                                     **COLLEEN KOLLAR-KOTELLY**
                                     United States District Judge

---

[7] The FDIC appears to be concerned that the referenced allegations may be used as a basis for discovery requests or submitted to the jury at trial. Such concerns are premature. The FDIC will have the opportunity to object to discovery requests and to file appropriate motions *in limine* in advance of trial.